IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-08-00149-CR

 

Melissa Matus,

                                                                                    Appellant

 v.

 

The State of Texas,

                                                                                    Appellee

 

 

 



From the County Court
at Law No. 1

McLennan County, Texas

Trial Court No. 20076115CR1

 



memorandum Opinion



 

A jury found Appellant Melissa Matus
guilty of the offense of cruelty to an animal.  The trial court assessed her
punishment at ninety days in the McLennan County Jail and a $2,000 fine but suspended
the sentence and placed her on community supervision for eighteen months.  Raising
five issues, Matus appeals.  We will affirm.

The information alleged that on or about
February 15, 2006, Matus “did then and there intentionally or knowingly fail
unreasonably to provide necessary care for a horse in the defendant’s custody,
by failing to properly groom or treat or medicate … .”

At the time of the alleged offense,
section 42.09 of the Penal Code provided:  “A person commits an offense if the
person intentionally or knowingly … fails unreasonably to provide necessary
food, care, or shelter for an animal in the person’s custody.”  Act of May 24,
2001, 77th Leg., R.S., ch. 450, § 1, 2001 Tex. Gen. Laws 887, 887 (current
version at Tex. Penal Code Ann. §
42.09(a)(2) (Vernon Supp. 2010)).  “‘Necessary … care’ includes … care provided
to the extent required to maintain the animal in a state of good health.”  Id.
at 888 (current version at Tex. Penal
Code Ann. § 42.09(b)(6)).

Sufficiency of the Evidence

In her first issue, Matus contends that
the evidence is factually insufficient to show that she failed unreasonably to
care for her horse.  The court of criminal appeals recently held that there is
“no meaningful distinction between the Jackson v. Virginia
legal-sufficiency standard and the Clewis factual-sufficiency standard”
and that “the Jackson v. Virginia legal-sufficiency standard is the only
standard that a reviewing court should apply in determining whether the
evidence is sufficient to support each element of a criminal offense that the
State is required to prove beyond a reasonable doubt.”  Brooks v. State,
323 S.W.3d 893, 902, 912 (Tex. Crim. App. 2010).  Accordingly, we will apply
the Jackson v. Virginia sufficiency standard to this issue.  See,
e.g., Valdez v. State, --- S.W.3d ---, ---, 2010 WL 5269818, at *6 (Tex.
App.—San Antonio Dec. 15, 2010, no pet. h.) (applying legal-sufficiency
standard to factual-sufficiency complaint); Kibble v. State, --- S.W.3d
---, ---, 2010 WL 4910236, at *2 (Tex. App.—Houston [1st Dist.] Dec. 2, 2010,
no pet. h.) (same).

When reviewing a challenge to the sufficiency
of the evidence to establish the elements of a penal offense, we must determine
whether, after viewing all the evidence in the light most favorable to the
verdict, any rational trier of fact could have found the essential elements of
the offense beyond a reasonable doubt.  See Jackson v. Virginia, 443
U.S. 307, 318-19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).  Our duty is to
determine if the finding of the trier of fact is rational by viewing all of the
evidence admitted at trial in the light most favorable to the verdict.  Adelman
v. State, 828 S.W.2d 418, 422 (Tex. Crim. App. 1992).  In doing so, any
inconsistencies in the evidence are resolved in favor of the verdict.  Curry
v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

When performing a sufficiency review, we
may not reevaluate the weight and credibility of the evidence and substitute
our judgment for that of the fact-finder.  Dewberry v. State, 4 S.W.3d
735, 740 (Tex. Crim. App. 1999).  Instead, we “determine whether the necessary
inferences are reasonable based upon the combined and cumulative force of all
the evidence when viewed in the light most favorable to the verdict.”  Hooper
v. State, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007).  We must presume that
the fact-finder resolved any conflicting inferences in favor of the prosecution
and defer to that resolution.  Jackson, 443 U.S. at 326, 99 S. Ct. at 2793; Clayton v. State, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

Failed unreasonably to care for the
horse

In 1995, Matus and her then-husband
purchased “Paint,” a stunted quarter-horse that was possibly part pony, for
their daughter Kaitlyn.  At that time, Paint’s age was between fifteen and
seventeen years.  Paint was moved to Matus’s property in 2003.  Evelyn Bench,
an equine investigator with Habitat for Horses, a nonprofit organization that
is a foster and rehabilitation home for horses, testified that she went to
Matus’s property in October of 2004 to get a horse (a palomino named Gusto)
from Matus that was being donated.  While there, Bench noticed Paint’s long,
wiry hair and told Matus that it might have Cushing’s disease and that she
might want to have her veterinarian check it.  Matus replied that she would do
so.

In the summer of 2005, Waco Police
Detective Michelle Starr, a horse owner, was passing by Matus’s rural property
on a daily basis while driving to and from work.  She could see Paint from the
road and became concerned about Paint’s condition because, despite the
100-degree heat, it still had curly long hair, and on her drives home, she saw it
standing in water up to its belly.  At that time, Paint looked chubby or fat.  About
six months later, in February 2006, Starr noticed that Paint had lost a lot of
weight.  Based on Paint’s long hair, she thought it might have Cushing’s
disease, and with the weight loss, she was concerned that it was not getting
any medical attention, which she thought it needed.  Starr thus contacted a
fellow detective, Donnie Morgan, who had experience with animal-cruelty cases,
and asked him to go with her to look at Paint.  

On February 14, 2006, Starr and Morgan
drove to Matus’s property.  Morgan initially looked at Paint from the road
through a camera lens and thought he looked 
“obviously sick.”  After observing Paint for about twenty minutes, Morgan
thought that “something was wrong with this horse.”  When the horse tried to
walk, it was like “walking on egg shells,” “walking up on its toes, just real
gingerly.”  Morgan and Starr walked up to the pen and climbed over the fence to
get a closer look.  Morgan and Starr both said that Paint’s tail and rear legs
were crusted with diarrhea and its hooves were long, cracked, and needed
trimming.  Morgan took numerous photographs of Paint that were in evidence. 
Starr and Morgan both said that the two other horses in Matus’s pens that day
looked to be in good condition.

Morgan and Starr also noted that Paint’s
mane had a lot of cockleburs in it, and there was some type of knot or abscess
on its head.  Morgan said that Paint had really labored breathing and few
teeth, and that its tongue was hanging out a little, which Morgan said was a
sign that a horse or cow is about to die.  Morgan concluded that Paint was
acting as if it were suffering; he thought that it was in pain from walking and
breathing.  Morgan decided to seize the horse without a warrant because he
thought the horse was about to die.  No one was at Matus’s adjacent mobile
home, and Morgan could not reach her by phone, so he left his card in her
mailbox with a note that he had taken her horse.

Starr attended the post-seizure hearing
before a justice of the peace, and she said that Matus testified that she was
not aware that Paint had Cushing’s disease and that she was not seeking medical
treatment for the horse.  Morgan also attended that hearing, and he said that
Matus testified that she knew that Paint had been ill for five to six years and
that she “was her own veterinarian.”

Paint was boarded with a non-equine
veterinarian for a day and then was taken to Dr. Ronnie Edwards, an equine
veterinarian.  After about ten days, Dr. Edwards euthanized Paint.  Dr. Edwards
testified that because of Paint’s emaciated condition and long hair, he
immediately suspected Cushing’s disease (or syndrome).  Paint then tested
positive for Cushing’s disease, which is a disease of the pituitary gland and
leads to diabetes, which then causes laminitis.  Its symptoms include weight
loss, muscle loss, weakness, hirsutism (long hair), depression, lethargy,
excessive thirst and hunger, and breakdown of the ligamentous structures of the
leg.  The cause of Cushing’s is unknown, and while it is treatable, it is not
curable.  Dr. Edwards said that Matus did not cause Paint to get Cushing’s.  Once
Cushing’s reaches a certain stage in older horses, its symptoms are largely
irreversible.

Dr. Edwards assessed Paint’s body
condition with a score of 2, explaining that horses are scored on a scale of 1
to 9, with 0 being a horse that has died from malnutrition and 10 being a horse
that has died from being overweight.  Most horses are scored at a 5 or 6. 
Paint’s life expectancy at that time was probably “not very long” and real cold
weather would have led to its death from hypothermia because of lack of fat and
muscle.  And if a horse like Paint were to go down to the ground in real cold
weather, it would not have been able to get back up because of the weakness.  Also,
Paint’s teeth were in “very bad” shape.  In addition to missing teeth, Paint’s
teeth had not been floated (grinded and smoothed so the horse can grind grain
and swallow it).  Dr. Edwards thought that Paint’s teeth had never been
floated, but if they had been, it had been at least two or three years. 
Floating Paint’s teeth and a correct diet for an older horse would have helped
Paint’s diarrhea and constipation problem.

Dr. Edwards said that Paint’s hooves
were not in good shape; they were not kept trimmed and that they showed signs
of founder (laminitis), which is linked to Cushing’s and diabetes.  Contrary to
Morgan’s testimony, Dr. Edwards said that Paint walked “pretty good.”  Dr.
Edwards confirmed that Paint had lots of cockleburs in its main and dried feces
on its back legs.

Cushing’s is treated with Pergolide, a
human medication, which costs between $1.50 and $3.00 a day, depending on where
one buys it.  Dr. Edwards said that Pergolide would have helped Paint’s
condition but that its other problems (diet and teeth) would have needed to be
addressed also.   If Paint’s Cushing’s had been treated earlier, the horse “probably
would have done better” and could probably have had “a few more years of
quality life.”  Dr. Edwards believed that Matus had not cared for Paint—“he was
in bad shape.”  He could not say that Paint was suffering, but it was
uncomfortable.

On cross-examination, Dr. Edwards
answered hypothetically that if Paint were being brushed periodically, fed and
provided water daily, given pain medication, and kept stress-free, he would not
think the owner was mistreating, being cruel, or not caring for the horse.  But
on re-direct, Dr. Edwards said that the horse’s condition would have indicated
that something was wrong or that the horse might have Cushing’s and that he
would have recommended to the owner of a horse in Paint’s condition to take the
horse to a veterinarian and not to try to treat the horse on their own.

Clay Link, Matus’s ex-boyfriend,
testified that he helped Matus care for Paint during their year-and-a-half
relationship in the 2003 and 2005 time frame.  Link lived on Matus’s property
then, and during the week he and Matus cared (fed, watered, and groomed) for
Paint, and Matus’s daughter Kaitlyn cared for it on the weekends.  They had a
farrier come out to care for Matus’s horses’ feet.  Paint’s condition in 2004
was “pretty good.”  Marc Scott, a farmer and rancher who lived near Matus,
delivered hay every week or two to Matus for her horses starting in October
2005.  He noticed that Paint had lost weight and discussed it with her, and
Matus told him that Paint had some kind of disease.  He said that Matus
appeared to care for Paint, but after being shown a photo of Paint when it was
seized, Scott said he would probably have taken it to a veterinarian if the
horse were his.  Kaitlyn Matus testified that she thought her mother adequately
took care of Paint.  She had seen Paint the weekend before it was seized.  The
horse was skinny, but “he was getting bigger, like he looked like he had put on
some weight, so we thought he was doing pretty good.”

Matus testified.  She has had or has
owned horses her whole life.  She first noticed something was wrong when Paint
did not shed its winter coat in 2004, and she clipped its hair that summer and
in the summer of 2005.  Matus explained that Paint’s hair was long in February
of 2006, when it was seized, because horses are not clipped in the winter, a
fact agreed to by Dr. Edwards.  She also explained that because of the cold
weather in January and February of 2006, it had not been feasible to wash the
feces off Paint’s rear legs and tail, and at the time she was waiting for a
warm day to do that.

She suspected that Paint had Cushing’s,
and she spoke with several people about it and researched it on the Internet.  She
first said that she noticed that Paint had lost weight in January of 2006, but
then later said it was in the Fall of 2005 when she realized the weight loss
and changed Paint’s feed to increase the protein level, but the increase was
too sudden and it gave Paint diarrhea.  She then changed its ration a little.  Matus
gave Paint “Bute,” a pain reliever for horses, when it appeared to be lame or
to not be feeling well, and it seemed to help.  She regularly “picked” her
horses’ feet and did some basic trimming and rasping, but she usually had a
farrier care for their feet.  Given Paint’s age and the cost of treatment,
Matus said she made Paint “comfortable.”  At that time, Matus was “barely
making ends meet.”  Because of her job, she was leaving home before daylight
and getting home after dark, so she did not see her horses every day.  An
ex-boyfriend was watering and feeding her horses.

On cross-examination, Matus admitted
that Paint was never seen by a veterinarian for Cushing’s.  She also admitted
that Paint was dirty from the feces and that Paint’s teeth had not been floated
“lately.”  Matus said that giving Paint away was not an option because it
belonged to her daughter.  She admitted to telling Morgan that Paint “had the
right to die in the pasture.”

The jury was correctly instructed that,
regarding the offense of intentionally or knowingly failing unreasonably to
provide necessary care for an animal, “necessary care” includes “care …
provided to the extent required to maintain the animal in a state of good
health.”  There was ample testimony that Paint was not in a state of good
health, and Dr. Edwards gave detailed testimony about what Matus could have done
to improve Paint’s quality of life.  He also said that Matus should have had
Paint seen by a veterinarian.

As for Matus’s tacit argument that she lacked
the resources to provide Paint the veterinary care that was needed, the law
provided no such excuse, as the State argued at trial.  See, e.g., Martinez
v. State, 48 S.W.3d 273, 276, 277 n.1 (Tex. App.—San Antonio 2001, pet.
ref’d) (“Failure to provide necessary care is cruelty to animals and a criminal
offense, even though the record in this case reveals neglect arising out of a
lack of resources rather than outright cruelty.”); see also id. at 278
(Lopez, J., concurring).

We
recognize that the jury was faced with some conflicting evidence, but the jury is the exclusive judge
of the facts, the credibility of the witnesses, and the weight to be given to
the witnesses’ testimony.  Jaggers v. State, 125 S.W.3d 661, 670 (Tex.
App.—Houston [1st Dist.] 2003, pet. ref’d).  The jury may believe all, some, or
none of any witness’s testimony.  Sharp v. State, 707 S.W.2d 611, 614
(Tex. Crim. App. 1986).  As the reviewing court, we “should not substantially
intrude upon the jury’s role as the sole judge of the weight and credibility of
witness testimony.”  Vasquez v. State, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002).  We must defer to the jury’s determination concerning what weight to
give contradictory or conflicting testimonial evidence.  See, e.g., In re
A.B., 133 S.W.3d 869, 873-74 (Tex. App.—Dallas 2004, no pet.); Scugoza
v. State, 949 S.W.2d 360, 362-63 (Tex. App.—San Antonio 1997, no pet.).

Viewing the evidence in the light most
favorable to verdict, we conclude that a rational jury could have found that
Matus failed unreasonably to care for Paint.  The evidence on that element of
the offense is sufficient.  We overrule issue one.

Mens rea

Issues two
and three assert that the evidence is legally and factually insufficient to
show that Matus acted intentionally and knowingly.  As discussed above, because
we no longer review the evidence for factual sufficiency, we overrule issue
three and will proceed to a sufficiency review for issue two under the Jackson
v. Virginia sufficiency standard.

Cruelty to animals is a “nature
of the conduct” offense.  See Amaya v. State, 733 S.W.2d 168, 174 (Tex.
Crim. App. 1986).  A person acts intentionally with
respect to the nature of the conduct when the person has a conscious objective
or desire to engage in the conduct; a person acts knowingly when he is aware of
the nature of his conduct. Tex. Penal
Code Ann. § 6.03(a), (b) (Vernon 2003).  Proof of a culpable mental
state almost invariably depends upon circumstantial evidence.  Krause v.
State, 243 S.W.3d 95, 111 (Tex. App.—Houston [1st Dist.] 2007, pet. ref’d). 
A jury may infer a culpable mental state from the circumstances surrounding the
offense of cruelty to animals.  Martinez, 48 S.W.3d at 276 (citing Pine
v. State, 889 S.W.2d 625, 629 (Tex. App.—Houston [14th Dist.] 1994, pet.
ref’d)).

A jury could infer a culpable mental
state from the circumstantial evidence of Paint’s physical condition.  See
Martinez, 48 S.W.3d at 276 (“Here, the evidence indicates obvious and
severe illness, and a long-neglected need for treatment.  Presented with such
an obvious need for treatment, a jury could easily infer intent or knowledge.”). 
Further evidence of Matus’s culpable mental state came from several witnesses. 
Bench testified that when she told Matus that Paint might have Cushing’s and
that she might want to have her veterinarian check it, Matus replied that she
would do so.  Starr testified about the palomino that Bench had come to get,
stating that she had noticed it to be “emaciated, really skinny,” and it “looked
like he was starving.”  Starr contacted the Sheriff’s Department to complain,
which led to Matus giving that horse away.  Finally, Matus admitted that she
suspected Paint had Cushing’s, researched it, and decided to treat it herself
and not to have a veterinarian see the horse.  These admissions showed Matus’s
deliberateness and purpose in how she chose to treat Paint.

Viewing the evidence in the light most
favorable to verdict, we conclude that a rational jury could have found that
Matus acted intentionally or knowingly in failing unreasonably to care for
Paint.  See Martinez, 48 S.W.3d at 276-77; see also Pine, 889
S.W.2d at 629-30.  The evidence on a culpable mental state is sufficient.  We
overrule issue two.

Charge Error

In her fourth issue, Matus contends that
the trial court fundamentally erred in failing to tailor the jury charge so as
to restrict the mens rea instruction to “nature of the conduct.”  In the
instructions on the culpable mental states, the abstract portion of the charge included
“result-oriented” instructions with the “conduct-oriented” instructions:

            A person acts intentionally,
or with intent, with respect to the nature of his conduct or to a result of
his conduct when it is his conscious objective or desire to engage in the
conduct or cause the result.

 

            A person acts knowingly, or
with knowledge, with respect to the nature of his conduct or to
circumstances surrounding his conduct when he is aware of the nature of his
conduct or that the circumstances exist.  A person acts knowingly or
with knowledge with respect to a result of his conduct, when he is aware that his
conduct is reasonably certain to cause the result.  [Emphases added.]

 

In analyzing
a jury-charge issue, we first decide whether error exists.  Ngo v. State,
175 S.W.3d 738, 743 (Tex. Crim. App. 2005).  Referring to the result-oriented portions
in the above abstract paragraphs as “superfluous,” the State does not expressly
concede that error exists, but it does argue that reversible error does not
exist under applicable case law.  

We recently examined a nearly identical
charge issue and the State’s same response:

The court properly included abstract
definitions in the charge for both “intentional” and “knowing” conduct. 
However, the court erred by failing to limit these definitions to the nature of
the defendant’s conduct rather than the result of his conduct.  See Hughes,
897 S.W.2d at 296; Battaglia, 2007 WL 4098905, at *2; Whitfield,
2001 WL 40654, at *1; Rodriguez, 24 S.W.3d at 502.  Because Garcia
failed to object, reversal is required only for egregious harm.  Trejo v.
State, 280 S.W.3d 258, 261 (Tex. Crim. App. 2009); Battaglia, 2007 WL
4098905, at *1; Whitfield, 2001 WL 40654, at *2; Rodriguez, 24
S.W.3d at 503.

 

            Citing Plata v. State,
the State characterizes each of these abstract definitions as a superfluous
instruction which “never produces reversible error in the court’s charge
because it has no effect on the jury’s ability fairly and accurately to
implement the commands of the application paragraph.”  926 S.W.2d 300, 302-03
(Tex. Crim. App. 1996), overruled on other grounds by Malik v. State,
953 S.W.2d 234, 239 (Tex. Crim. App. 1997).  However, the Court in Plata
also observed, “Reversible error only occurs in the giving of an abstract
instruction when the instruction is an incorrect or misleading statement of a
law which the jury must understand in order to implement the commands of the
application paragraph.”  Id. at 302.  Here, Garcia’s complaint
potentially fits within the category of “reversible error” identified in Plata
because the challenged definitions were incorrect with regard to the culpable
mental state which the jury must find in order to convict him of indecency by
contact.  And this error is magnified to the extent that the application
paragraph itself misstates the requisite culpable mental state.

 

            Thus, we will examine the
record for egregious harm under the standard first enunciated in Almanza v.
State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh’g).  See
Dougherty v. State, No. PD-1411-05, 2006 WL 475802, at *1 (Tex. Crim. App. Mar.
1, 2006) (per curiam) (not designated for publication).

 

Garcia v. State, No. 10-09-00162-CR, 2010 WL 1269689, at
*2-3 (Tex. App.—Waco Mar. 31, 2010, no pet.) (mem. op., not designated for
publication).

Because cruelty to animals is a
conduct-oriented offense, the charge’s abstract portion was erroneous by including
result-oriented definitions with the conduct-oriented definitions.  See id.
at *2.

Because Matus did not object to the
charge, we analyze this error under the familiar Almanza standard.  Allen v. State, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008). 
Unobjected-to jury charge error will not result in reversal
of a conviction in the absence of “egregious harm.”  Almanza,
686 S.W.2d at 171.  In examining the record for egregious harm, we
consider:  (1) the entire jury charge; (2) the state of the evidence, including
the contested issues and the weight of the probative evidence; (3) the final
arguments of the parties; and (4) any other relevant information revealed by
the record of the trial as a whole.  Olivas v. State, 202
S.W.3d 137, 144 (Tex. Crim. App. 2006).  Charge error is egregiously
harmful if it affects the very basis of the case, deprives the defendant of a
valuable right, or vitally affects a defensive theory.  Stuhler v. State,
218 S.W.3d 706, 719 (Tex. Crim. App. 2007).

 The application paragraph in this case
was correct, and the charge correctly instructed the jury on the substantive
law for the offense of cruelty to animals, thus informing the jury of what the
State had to prove.  See Garcia, 2010 WL 1269689, at *4.  Within the
context of the charge as a whole, the error appears less harmful.  See id.

The evidence on Matus’s conduct and
Paint’s condition was contested, but, as we found above, the evidence was
sufficient to support the conviction.  Matus argues that the State focused much
of its evidence on the “result” of Matus’s conduct, but that is not necessarily
true.  The State did not present evidence or argue that Matus caused Paint to
get Cushing’s or that she wanted Paint to suffer or to be in bad health. 
Instead, to meet its burden of proof, the State presented evidence that Paint
was not in a state of good health.[1] 
The evidence on Paint’s condition was thus necessary for the jury to determine
the reasonableness of Matus’s conduct.  For this same reason, the State’s
emphasis in closing argument on Paint’s condition was likewise not
inappropriate.  Accordingly, we find that Matus did not suffer egregious harm
and overrule issue four.

Motion to Suppress

            In her fifth issue, Matus
contends that the trial court abused its discretion in overruling her motion to
suppress evidence of Detective Morgan’s warrantless entry into her horse pen
and warrantless seizure of Paint.  It is undisputed that Morgan went on to
Matus’s property and seized Paint without a warrant.

We review a trial court’s
ruling on a motion to suppress evidence under a bifurcated standard of review. 
Amador v. State, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007).  In
reviewing the trial court’s decision, we do not engage in our own factual
review.  Romero v. State, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); Best
v. State, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.).  The
trial judge is the sole trier of fact and judge of the credibility of the
witnesses and the weight to be given their testimony.  Wiede v. State,
214 S.W.3d 17, 24-25 (Tex. Crim. App. 2007).  Therefore, we give almost total
deference to the trial court’s rulings on (1) questions of historical
fact, even if the trial court’s determination of those facts was not based on
an evaluation of credibility and demeanor; and (2) application‑of‑law‑to‑fact
questions that turn on an evaluation of credibility and demeanor.  Amador,
221 S.W.3d at 673; Montanez v. State, 195 S.W.3d 101, 108-09 (Tex. Crim.
App. 2006).  But when application-of-law-to-fact questions do not turn on the
credibility and demeanor of the witnesses, we review the trial court’s rulings
on those questions de novo.  Amador, 221 S.W.3d at 673.

When reviewing the trial
court’s ruling on a motion to suppress, we must view the evidence in the light
most favorable to the trial court’s ruling.  Kelly v. State, 204 S.W.3d
808, 818 (Tex. Crim. App. 2006).  When the trial court makes explicit fact
findings, we determine whether the evidence, when viewed in the light most
favorable to the trial court’s ruling, supports those fact findings.  Id.
at 818-19.  We then review the trial court’s legal ruling de novo unless
its explicit fact findings that are supported by the record are also
dispositive of the legal ruling.  Id. at 819.

The suppression hearing took place at
the end of the first day of trial testimony.  Only Morgan testified, but in
making its ruling and stating its findings on the record, the trial court also
referred to the testimony of Detective Starr, who had testified that day, as
had Dr. Edwards.  Also, Morgan’s trial testimony included testimony about his entry
onto Matus’s property and into her horse pens.

In a review of a trial
court’s suppression hearing ruling, we generally consider only the evidence
adduced at the suppression hearing.  Rachal v. State, 917 S.W.2d 799,
809 (Tex. Crim. App. 1996).

 

However, this general rule
is inapplicable where, as in this case, the suppression issue has been
consensually re-litigated by the parties during trial on the merits.  Id.  [Hardesty v. State, 667 S.W.2d 130, 135 n.6 (Tex. Crim. App. 1984).] 
Where the State raises the issue at trial either without objection or with
subsequent participation in the inquiry by the defense, the defendant has made
an election to re-open the evidence, and consideration of the relevant trial testimony
is appropriate in our review.  Id. at 135; See also Webb v. State,
760 S.W.2d 263, 272 n.13 (Tex. Crim. App. 1988), cert. denied, 491 U.S.
910, 109 S.Ct. 3202, 105 L.Ed.2d 709 (1989).  Moreover, it would be
unreasonable to ignore trial evidence in our review of the court’s suppression
decision only to be confronted by the evidence in our consideration of whether
the error was harmless.  Tex. R. App. P.
81(b)(2).

 

Id.

 

Kearney v. State, 181 S.W.3d 438, 446 (Tex. App.—Waco
2005, pet. ref’d); see also Gutierrez v. State, 221 S.W.3d 680, 687
(Tex. Crim. App. 2007).  We agree with Matus that the parties consensually
relitigated the suppression issue at trial, and to the extent necessary, we
will consider trial evidence as part of the suppression record.

On appeal, the State advances several
theories in support of the trial court’s suppression ruling.  We focus only on
the “emergency doctrine” exception to the warrant requirement, as we find that
it supports the trial court’s findings and ruling.  

The emergency doctrine is an exception
to the constitutional prohibition of searches and seizures carried out without
a warrant from a magistrate. Bray v. State, 597 S.W.2d 763, 764 (Tex. Crim.
App. 1980).  The Fourth Amendment does not prohibit a warrantless search and
seizure when there is a need to act immediately to protect or preserve life, or
to prevent serious injury.  Id.; see also Mincey v. Arizona, 437
U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978).

 

Pine, 889 S.W.2d at 631.

Under the emergency doctrine, a
warrantless entry is permitted if the officer has an immediate, reasonable
belief that he or she must act to “protect or preserve life or avoid serious
injury.”  Laney v. State, 117 S.W.3d 854, 861 (Tex. Crim. App. 2003)
(quoting Mincey, 437 U.S. at 392, 98 S.Ct. at 2412).

“We have used an objective standard of
reasonableness in determining whether a warrantless search is justified under
the Emergency Doctrine.  Brimage, 918 S.W.2d at 501; Colburn, 966
S.W.2d at 519.  This objective standard looks at the police officer’s conduct
and “takes into account the facts and circumstances known to the police at the
time of the search.”  Brimage, 918 S.W.2d at 501 (citing Garcia v.
State, 827 S.W.2d 937 (Tex. Crim. App. 1992); Janicek v. State, 634
S.W.2d 687, 691 (Tex. Crim. App. 1982)); Colburn, 966 S.W.2d at 519. 
Furthermore, we look to ensure that the warrantless search is “strictly
circumscribed by the exigencies which justify its initiation.”  Mincey,
437 U.S. at 393, 98 S.Ct. at 2413; Bass v. State, 732 S.W.2d 632, 635
(Tex. Crim. App. 1987).  If the emergency doctrine applies, the police may
seize any evidence that is in plain view during the course of their legitimate
emergency activities.  Mincey, 437 U.S. at 393, 98 S.Ct. 2408 (citations
omitted); Brimage, 918 S.W.2d at 501.

 

Id. at 862.

            In an animal cruelty case, to
justify the warrantless seizure under the emergency doctrine, the State must
show (1) that the officer had probable cause to believe the animal was being
cruelly treated, and (2) that obtaining a warrant was impracticable because the
officer reasonably believed there was an immediate need to act to preserve a
life.  Pine, 889 S.W.2d at 631 (citing Brimage v. State, 918
S.W.2d 466, 500 (Tex. Crim. App. 1994) and Crane v. State, 786 S.W.2d
338, 346 (Tex. Crim. App. 1990)).

            At the suppression hearing,
Morgan testified that he had been a peace officer for twenty-three years and
had been around horses for most of his life.  He has owned fifteen horses.  He
attended a course on the health and safety of horses in 2002, and from that
course he was certified to perform body condition and health and condition
ratings on animals in the field.

As a result of Starr’s concerns about
Paint’s condition, they drove together to Matus’s property.  He was able to
view Paint from the road passing Matus’s property by using his zoom camera
lens.  He observed Paint for about twenty minutes and saw Paint’s tongue
hanging out, its head hanging down, and its long hair, along with dried feces
on its rear.  He observed Paint’s labored walking (like it was walking on egg
shells) and thought it was lame from laminitis.

They then drove onto Matus’s property,
turned into her driveway, and parked next to her mobile home.  They then walked
up to the adjacent horse pen, and Morgan climbed on the fence to better observe
Paint.  He noticed a knot on the side of Paint’s face and that its eyes were
half closed.  Morgan next opened the gate and went into the pen to look in
Paint’s mouth to ascertain its age.  Morgan did not go into the barn, but he
did not see any feed or hay in the pen for the five horses there.  He saw one
thirty-gallon water bucket that was half-full.

Based on his observations of Paint and
his training and background, Morgan believed that Paint was in imminent danger
and was about to die, and he thought that it might die in the six- to
eight-hour time period that it would take him to get a warrant.  Morgan thus
decided to seize the horse and get it to a veterinarian.  He called the
Sheriff’s Department, which he had an arrangement to work with on animal
cruelty cases, and a person was called to come and get Paint.  That person
typically puts seized animals on his place if they are in good enough
condition, but when he saw Paint, he refused to take it to his place and thus
took it directly to Dr. Jager, a non-equine veterinarian, where it stayed for a
day before being taken to Dr. Edwards.

In denying the suppression motion, the
trial court made an oral finding of emergency based on Starr’s and Morgan’s
testimony, the photographs of Paint, and the fact that Paint was soon
euthanized.  Relying on Pine, Matus argues that Morgan’s lay opinion on
Paint’s condition was not enough to justify seizure under the emergency
doctrine and implies that expert testimony from a veterinarian is necessary.  See
Pine, 889 S.W.2d at 631-32.  We agree with the State that Pine did
not establish a veterinarian requirement; that case’s emphasis on the
veterinarian’s opinion related to its analysis of the reasonableness of the
officer’s belief that, given the need to protect the colt’s life, obtaining a
warrant would be impracticable.  See id. at 632.  Also, the officer had
sought the veterinarian not to justify seizure under the emergency doctrine,
but to begin treating the colt.  Id. at 631.

Viewing the evidence in the light most favorable to the trial court’s
ruling, we cannot say the trial court abused its discretion in finding the
emergency doctrine applicable and in thus denying the motion to suppress.  We
overrule issue five.

Having overruled all of
Matus’s issues, we affirm the trial court’s judgment.

            

 

 

REX
D. DAVIS

Justice

 

Before Chief
Justice Gray

and
Justice Davis[2]

Affirmed

Opinion
delivered and filed March 30, 2011

Do not publish

[CR25]









[1] “‘Necessary … care’ includes … care provided to
the extent required to maintain the animal in a state of good health.”  Act of
May 24, 2001, 77th Leg., R.S., ch. 450, § 1, 2001 Tex. Gen. Laws 887, 888
(current version at Tex. Penal Code Ann.
§ 42.09(b)(6)).





[2] The Honorable Felipe Reyna, a former
justice on this court, was on the panel and present for argument, but having
left office on December 31, 2010, he did not participate in this decision.  See
Tex. R. App. P. 41.1(c).