Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio



★ ★ ★ ★ ★ ★ ★ ★



# OPINION

No. 04-09-00420-CR

Juan A. **VALDEZ**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 290th Judicial District Court, Bexar County, Texas
Trial Court No. 2006-CR-9328
Honorable Dick Alcala,[1] Judge Presiding

Opinion by:      Phylis J. Speedlin, Justice

Sitting:         Karen Angelini, Justice
                 Phylis J. Speedlin, Justice
                 Rebecca Simmons, Justice

Delivered and Filed:  December 15, 2010

AFFIRMED

Juan Valdez was convicted of aggravated sexual assault and indecency with a child.  On appeal, he asserts the evidence is insufficient to sustain the convictions, and also complains the trial court erred in overruling his motion to suppress.  We affirm the judgment of the trial court.

---

[1] Sitting by assignment.

**BACKGROUND**

On June 21, 2006, Maxine Jimenez called police to report that her common law husband, Valdez, sexually abused Z.V., Valdez's biological daughter. Earlier that day, Maxine went to the grocery store while Valdez stayed home with his son and Z.V., then eight years old. Before she left, Valdez stated he was going to change clothes and instructed Maxine to keep the children out of the master bedroom while he changed. When Maxine returned from the store about ten minutes later, she noticed that Z.V. was not in the living room as she had been when Maxine left. Maxine went to the master bedroom and opened the door, and was shocked to see Valdez lying naked on the bed with his knees apart and his feet up and Z.V. next to him on her hands and knees. Upset, Maxine left the house with the couple's three year-old son and walked to her mother's apartment.

Once at her mother's, Maxine called police to report what she had seen. Officer Gina Mendez met Maxine at her mother's, and then left to pick up Z.V. from the couple's home. When Officer Mendez arrived at the home, Valdez answered the door and explained that Z.V. had run into his room and jumped on his bed after he got undressed. Valdez was transported to the police station for questioning, as were Maxine and Z.V. Detective Randy Jones interviewed Z.V. Z.V. initially told Detective Jones that nothing had happened and that she had not been abused by her father. Z.V., however, appeared scared, and asked to have Maxine in the interview room with her. Once Maxine came in, Z.V. said that bad things had happened to her. She stated that earlier that day when Maxine walked in, she had just sucked her father's pee-pee. Sometimes when she did this, liquid came out and her father made her drink it. Her father also put his pee-pee in her butt, and his fingers in her cookie, which Detective Jones took to mean her vagina. Z.V. stated these things happened every time she was left alone with her father. Her

father made her take her clothes off and say obscenities to him, and he threatened to beat her if she told on him. Her father also made her watch nasty movies, which he kept locked in a box in his bedroom.

Upon receiving the information about the pornographic DVDs, Detective Jones asked Maxine to sign a form consenting to a search of the house; she voluntarily did so. Jones contacted Officer Shawn McGivens and asked him to go to the house and stay there to secure evidence until he arrived. Jones told McGivens that he had obtained consent to search the house. Officer McGivens testified that upon arriving at the house, he encountered a woman whom he believed to be the owner of the house. The woman was Maria Elizondo, Valdez's mother; she did not reside at the house with Valdez and Maxine. McGivens told Ms. Elizondo that he was there to collect some adult videos as evidence. Ms. Elizondo appeared to know why he was there, invited him in, and took him straight to the master bedroom. According to McGivens, she went into the closet and retrieved a safe. She used a key to open the safe, and took out the DVDs and placed them on the bed.

Maria Elizondo's recollection of the event, however, was very different. She stated that she did not give Officer McGivens permission to enter the house. She explained McGivens told her Valdez had given consent to search, and that she needed to accompany him to the bedroom. She stated that Detective Jones took the lock box from the closet, and ordered her to unlock it. She had a key ring in her pocket, and after unsuccessfully trying several keys, Jones got mad, grabbed the keys from her, and opened the box himself. Ms. Elizondo claimed the police threatened to arrest her if she did not cooperate.

After the evidence was photographed and collected, Detective Jones returned to the police station, where he and another detective interviewed Valdez. Valdez acknowledged having

a problem with pornography, which began when he was eleven years old. Valdez never admitted assaulting his daughter.

After speaking with Detective Jones, Z.V. and Maxine were taken to Santa Rosa Hospital. Cynthia Garcia, a sexual assault nurse examiner (SANE nurse) performed a sexual assault exam on Z.V. and obtained a history from her. Z.V. told Garcia that her father made her have sex with him, and detailed the types of sexual contact that occurred. She stated that earlier that day, when Maxine walked in, her father made her lick his private part and suck it, and he touched her butt and her cookie. He also made her say nasty words and watch nasty movies which he kept in a locked box. Z.V. described one movie as "a zombie one." She stated that he kept the key to the box on the belt he wears to work. These incidents occurred about twice a week, beginning when she was six years old. Nurse Garcia's physical examination of Z.V. revealed acute bruising in the soft pallet in the back of her throat. Garcia stated such a finding raised the possibility of penile-oral penetration. All other findings were non-specific, which means that there are a number of possible causes for the finding. Dr. Nancy Kellogg, a pediatrician at the University of Texas Health Science Center, who also works at Santa Rosa Hospital, reviewed Nurse Garcia's SANE exam and testified that in her experience, non-specific examination findings occur in approximately 90% of child sexual assault cases. She also stated that there are often no observable behaviors in children who have been abused, and that it is common for children to "talk in pieces," meaning that they do not always initially divulge all the details of the abuse.

At trial, Z.V., who was then eleven years old, testified that her dad raped her more than once. On June 21, 2006, the day Maxine walked in, her father had called her into his bedroom and told her to take off her shorts. He was naked and lying on the bed with his knees up and

apart. After Maxine discovered them and stormed off, her father told her to "hush up." Then Z.V.'s grandparents and paternal aunt came over to the house. Her aunt, Veronica Preston, asked Z.V. whether anyone had hurt her, and Z.V. answered "no," because she was scared and she did not want her family to be mad at her. When police officers arrived at the house a short time thereafter, she also told them that nothing had happened because she was scared and she felt like she was being pressured to lie.

Later that night, Z.V. was taken to the police station where she was questioned by Detective Jones. She initially refused to acknowledge that her father had abused her, and at trial she testified that she did not tell the truth at first because she had made a promise to her dad. Z.V. asked to have Maxine present in the interview room, and then told the truth about her father raping her. Z.V. testified that she told Detective Jones that her hand touched her father's middle part and that his middle part touched her behind on June 21, 2006. She did not, however, tell the police that her mouth touched her father's middle part, because she felt scared. She stated that things like that happened more often than on just that one day. Her father touched her behind with his middle part more than once. He also tried to put it in her behind, but she told him to stop because it hurt. Her father once threatened to beat "the living crap" out of her if she told anyone what he did to her. Her father never tried to touch any other part of her body with his middle part, and he never tried to touch her middle part with any other part of his body.

On cross-examination, Z.V. was asked about speaking with her father's attorneys when her paternal grandmother, Ms. Elizondo, took her to their law office about two years after the June 21, 2006 incident. Z.V. admitted that she lied when she spoke to her father's attorneys. Although not true, she told the attorneys that her father never touched her, that she learned bad language from Maxine, and that her stepfather, not her father, watched pornographic movies.

Z.V. also stated that she did not like Maxine, who was mean to her and preferred her biological child over Z.V. and her brothers. On re-direct, Z.V. stated that she told different versions of what happened because she was scared and she did not want to hurt anyone's feelings.

After the State rested, the defense presented two witnesses. Debra Thompson, a family friend, testified that Z.V. told her she falsely accused her father of doing bad things to her because Maxine had promised to pay her $20. Veronica Preston, Valdez's sister, testified that on June 21, 2006, she received a call from her brother that something had happened and she should go to his house. When she arrived, Z.V. was watching cartoons and did not appear to be upset. Z.V. told Veronica that Maxine had stormed out of the house and called her dad a "sorry SOB." Z.V. also told Veronica that her father had yelled at her because she went into his room without knocking.

The jury found Valdez guilty of five counts of aggravated sexual assault of a child and two counts of indecency with a child. The trial court assessed punishment at 35 years' confinement in the Texas Department of Criminal Justice—Institutional Division for each of the five counts of aggravated sexual assault and 20 years' confinement for each of the two counts of indecency with a child. The trial court ordered all sentences to run concurrently. Valdez timely appealed.

### MOTION TO SUPPRESS

On appeal, Valdez complains the trial court erred in overruling his motion to suppress the seizure of the pornographic movies because Maxine Jimenez lacked either actual or apparent

authority to consent to the search of his lock box, and therefore the search and seizure violated both the Texas and United States constitutions.[2]

### Standard of Review

We apply a bifurcated standard of review when reviewing a trial court's ruling on a motion to suppress. *Hubert v. State*, 312 S.W.3d 554, 559 (Tex. Crim. App. 2010). We afford almost total deference to the trial court's determination of historical facts supported by the record, but review its application of the law to the facts *de novo*. *Id*.; *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008). Whether a third party had actual authority to consent to a search of another's property and whether an officer was reasonable in finding that a third party had apparent authority to consent are mixed questions of law and fact which we examine *de novo*. *Hubert*, 312 S.W.3d at 559-60. When, as here, the trial court does not make explicit findings of fact, we view the evidence in a light most favorable to the trial court's rulings and assume the trial court resolved any issues of historical fact or credibility consistently with its ultimate ruling. *Id.* at 560. If the trial court's decision is correct on any theory of law applicable to the case, its decision will be upheld. *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003); *State v. Ross*, 32 S.W.3d 853, 855-56 (Tex. Crim. App. 2000).

### Third-Party Consent

The basic purpose of the Fourth Amendment to the U.S. Constitution is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials. *See Berger v. New York*, 388 U.S. 41, 53 (1967). For this reason, searches conducted without a

---

[2] In his first and second issues, Valdez maintains that his United States and Texas constitutional rights to be free from an unreasonable search and seizure were violated. U.S. CONST. amend. IV; TEX. CONST. art. I, § 9. Valdez, however, concedes that the Texas Constitution does not afford him more relief than the United States Constitution, therefore, we direct our attention to Valdez's argument under the federal constitution. *See Patrick v. State*, 906 S.W.2d 481, 490 (Tex. Crim. App. 1995).

warrant are generally unreasonable *per se*. *See Katz v. United States*, 389 U.S. 347, 357 (1967). An exception to the warrant requirement is a search conducted by consent. *See Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002); *Welch v. State*, 93 S.W.3d 50, 52 (Tex. Crim. App. 2002). A third party may consent to the search if he possesses equal control over and authority to use the premises being searched. *Maxwell*, 73 S.W.3d at 281. Common authority rests "on the mutual use of property by persons generally having joint access or control for most purposes." *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974).

A consensual search may also be valid when an officer reasonably, though erroneously, believes that a third party purporting to provide consent has actual authority over the place or thing to be searched. *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990); *Hubert*, 312 S.W.3d at 561; *Mendoza v. State*, 30 S.W.3d 528, 531 (Tex. App.—San Antonio 2000, no pet.). In that case, apparent authority exists and the purported consent from the third party serves to make the search reasonable. *Hubert*, 312 S.W.3d at 561. This does not mean, however, that officers may rely upon consent given in ambiguous circumstances or that clearly appears unreasonable. *Rodriguez*, 497 U.S. at 186-89. The apparent authority doctrine for consenting to a search does not allow law enforcement officers to proceed without inquiry into ambiguous circumstances or to always accept at face value the consenting party's apparent assumption or claim of authority to allow the contemplated search. *Riordan v. State*, 905 S.W.2d 765, 771 (Tex. App.—Austin 1995, no pet.). When a search without a warrant is made, the State bears the burden to show that the search falls within one of the narrow exceptions to the warrant requirement in order for the search to be constitutionally permissible. *Rodriguez*, 497 U.S. at 181; *Hubert*, 312 S.W.3d at 561-62.

*Analysis*

Valdez argues that Maxine did not have actual or apparent authority to consent to the search of the lock box. We agree. A protected expectation of privacy may exist where a defendant has taken some special steps to protect his personal effects from the scrutiny of others. *See* 4 Wayne R. LaFave, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT at 168 (4th ed. 2007) (citing *United States v. Block*, 590 F.2d 535 (4th Cir. 1978)). Here, Valdez, by locking the box and not sharing access to that container with Maxine, took such special steps. Although Maxine had the authority to consent to a search of the common areas of the house, she did not have actual authority to consent to the search of the lock box because she lacked joint access or control over the lock box. Further, she lacked apparent authority to consent because she told the police she did not know where the box was located, and she did not possess a key to the lock box; in fact, at the suppression hearing, Maxine professed that she knew nothing about the box. Accordingly, no officer could reasonably believe that Maxine possessed mutual use of the lock box so as to give her the appearance of authority to consent to its search.

Ms. Elizondo, however, did have apparent authority to consent to the search of the lock box. Viewing, as we must, the evidence in the light most favorable to the trial court's ruling, Officer McGivens's testimony establishes that he reasonably believed that Ms. Elizondo had actual authority to consent to the search of the lock box. According to McGivens, he was dispatched to the Valdez home by Detective Jones, who testified that he told McGivens he had obtained consent to search the home. When McGivens arrived at the home, he encountered Ms. Elizondo. After informing her that he was there to collect some videos as evidence, she invited him in and took him directly to the master bedroom. Without prompting by McGivens, she retrieved the lock box from the closet, unlocked it, and placed the DVDs on the bed.

Given these facts, McGivens's belief that Ms. Elizondo had actual authority to open the lock box was reasonable. McGivens testified that he believed that Ms. Elizondo was the owner of the home because she was the person in control. It appeared to McGivens that Ms. Elizondo had common authority over the lock box because she knew exactly where it was located and had the key.[3] *See Rodriguez*, 497 U.S. at 188. Even though Ms. Elizondo was not the actual owner of the box and did not have authority to unlock it absent permission from her son, Officer McGivens's good faith mistake does not invalidate the search because he reasonably believed that she had common authority over the lock box. *Id.* Moreover, we cannot conclude that the situation was so ambiguous as to prompt McGivens to make further inquiry. *See Riordan*, 905 S.W.2d at 771. He had been told by Detective Jones that consent to search had been obtained, Ms. Elizondo appeared to be the owner of the home and McGivens had no reason to assume otherwise, and Ms. Elizondo took McGivens to the bedroom where she uncovered the lock box and opened it with a key that was in her possession. Accordingly, we conclude Ms. Elizondo had apparent authority to consent to the search of the lock box and therefore the trial court did not err in denying Valdez's motion to suppress. Valdez's first and second issues are overruled.

## SUFFICIENCY OF THE EVIDENCE

Next, Valdez complains the evidence is factually insufficient to support the jury's verdict. In *Brooks v. State*, the Texas Court of Criminal Appeals recently held that there is "no meaningful distinction between the *Jackson v. Virginia* legal-sufficiency standard and the *Clewis* factual-sufficiency standard" and that the *Jackson v. Virginia* standard is "the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt."

---

[3] Officer McGivens did not know where the key came from, only that Ms. Elizondo had the key. He stated that she did not have the keys on her person; he believed she went out of the bedroom and came back with the key. Ms. Elizondo testified that she had the key to the lock box in her pocket.

*Brooks v. State*, No. PD-0210-09, 2010 WL 3894613, at \*8, \*14 (Tex. Crim. App. Oct. 6, 2010) (plurality op.)[4]; *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996). Thus, the court held there is one universal sufficiency standard under which we evaluate all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *Brooks*, 2010 WL 3894613, at \*1; *see Poindexter v. State*, 153 S.W.3d 402, 405 (Tex. Crim. App. 2005) (citing *Jackson*, 443 U.S. at 318-19); *see also Rosales v. State*, No. 04-09-00498-CR, 2010 WL 4336171, at \*2 (Tex. App.—San Antonio Nov. 3, 2010, no pet. h.); *Gonzales v. State*, No. 04-09-00811-CR, 2010 WL 4229114, at \*2 (Tex. App.—San Antonio Oct. 27. 2010, no pet. h.). In conducting a sufficiency review, we must defer to the factfinder's credibility and weight determinations. *Brooks*, 2010 WL 3894613, at \*8. "After giving proper deference to the factfinder's role, we will uphold the verdict unless a rational factfinder must have had reasonable doubt as to any essential element." *Laster v. State*, 275 S.W.3d 512, 518 (Tex. Crim. App. 2009). Accordingly, we will review the evidence in a light most favorable to the verdict for Valdez's sufficiency claim.

Valdez contends the evidence is insufficient to sustain his convictions because Z.V., the complainant, equivocated when asked whether her father assaulted her. Initially, she told her paternal family and the police that nothing inappropriate occurred on June 21, 2006. Then, she changed her story and told Detective Jones and the SANE nurse that her father sexually assaulted her. More than two years later, she told her father's defense attorneys and Ms. Thompson that nothing bad happened, and that she falsely accused her father in exchange for $20. Thus, because Z.V. was the only true source of testimony regarding the sexual abuse by her father,

---

[4] Although only four judges joined the plurality opinion, a majority of the judges agreed that *Clewis* should be overruled and that a single standard of sufficiency review based on *Jackson v. Virginia* should be used in criminal cases. *Brooks*, 2010 WL 3894613, at \*14, \*15 (Cochran, J., concurring).

Valdez argues the fact that she contradicted herself on so many occasions should have given rise to reasonable doubt. We disagree. When viewing the evidence in the light most favorable to the verdict, we conclude the evidence is sufficient to support the jury's verdict.

Z.V. testified that her father digitally, vaginally, and anally assaulted her. He also made her perform oral sex on him. Z.V. recounted these details to Detective Jones and to Nurse Garcia. Although Z.V. admitted to denying the assaults to her paternal family, the jury could have reasonably inferred that Z.V. felt scared and pressured to lie to those who were close to her father, and, by contrast, felt comfortable sharing the details of her abuse when she was in a safe environment. Other evidence tended to corroborate Z.V.'s testimony that her father assaulted her. Maxine encountered Z.V. and Valdez together in the bedroom, where Valdez was lying naked on the bed with his knees spread apart. Z.V. was on her hands and knees with her head toward Valdez's knees. Further, the search of Valdez's home uncovered the lock box containing the pornographic movies that Z.V. described to Detective Jones. Nurse Garcia observed acute bruising in the soft pallet of Z.V.'s throat, which was consistent with Z.V.'s account of her father forcing her to perform oral sex on June 21, 2006.

Z.V. explained that she denied the assault to her Aunt Veronica because she did not want her father's family to be mad at her, and she was scared. She also denied the assault to Officer Mendez because she was scared and she felt like she was being pressured. Similarly, Z.V. initially denied the assault to Detective Jones because she had promised her father she would not tell anyone what had happened; however, once Maxine joined her in the interview room, she detailed the abuse to the detective. Z.V. also explained that she chose not to tell her father's defense attorneys the truth about him assaulting her. Additionally, she denied to Ms. Thompson that her father had assaulted her in an effort to keep herself out of trouble.

We must defer to the jury's determination of the weight to be given to contradictory testimonial evidence because resolution of the conflict is often determined by the jurors' evaluation of the witnesses' credibility and demeanor. *Johnson v. State*, 23 S.W.3d 1, 8 (Tex. Crim. App. 2000). Thus, considering all of the evidence in the light most favorable to the jury's verdict, we hold that a rational trier of fact could have found that the evidence at trial was sufficient to establish the elements of the offenses of indecency with a child and aggravated sexual assault beyond a reasonable doubt. *Brooks*, 2010 WL 3894613, at *5 (citing *Jackson*, 443 U .S. at 319); *see also* TEX. PENAL CODE ANN. § 21.11 (West Supp. 2010) (providing elements of offense of indecency with a child); TEX. PENAL CODE ANN. § 22.021 (West Supp. 2010) (providing elements of offense of aggravated sexual assault). Accordingly, we hold that the evidence is sufficient to support Valdez's convictions. We overrule Valdez's third issue and affirm the judgment of the trial court.

Phylis J. Speedlin, Justice

PUBLISH