Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio



# MEMORANDUM OPINION

No. 04-11-00400-CR

Veronica Ann **GARCIA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the County Court at Law No. 2, Bexar County, Texas
Trial Court No. 325113
Honorable Jason Wolff, Judge Presiding

Opinion by:    Phylis J. Speedlin, Justice

Sitting:    Catherine Stone, Chief Justice
Phylis J. Speedlin, Justice
Rebecca Simmons, Justice

Delivered and Filed:  March 21, 2012

AFFIRMED

Following her no-contest plea and placement on deferred adjudication community supervision, Veronica Ann Garcia appeals the trial court's denial of her pre-trial motion to suppress drug evidence and statements made by her at the scene.  We affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 23, 2010, police were called to the residence at 325 Kemper Street[1] by an individual who informed them a female with outstanding felony warrants for prostitution was present at the home. When the officers arrived, the homeowner Armando Salazar answered the front door. The officers asked Salazar if he knew the female suspect, Tanya Ranly, and if she was in the house. Salazar confirmed that he knew her and that she was in the house. When the officers asked whether they could come inside to locate Ranly, Salazar answered, "yes."[2] The officers asked Salazar where Ranly was, and Salazar answered that she was in the back bedroom with several other females. The officers walked directly to the back bedroom and proceeded to ask the three women in the room for identification. They identified Ranly, and, after confirming her warrants were active, placed her under arrest.

Officer James Williams stated that, as soon as he entered the bedroom, he noticed a purse lying on top of a dresser; the purse had two unlabeled prescription pill bottles sticking out in plain sight. After Ranly was identified and arrested, Officer Williams asked, "Who does this purse belong to?" The question was posed to everyone in the room. Garcia answered that it was her purse and the pills also belonged to her. Officer Williams asked why the pill bottles had no labels. Garcia responded that she had forgotten the bottles were in her purse. Williams then asked, "What are the pills?" and Garcia replied they were Vicodin and Clonazepam. Williams obtained Garcia's permission to open the bottles to see the pills inside; he did not remove the pills. Williams called poison control and described the appearance of the pills, confirming their identity. Garcia was then placed under arrest for possession of Clonazepam, a Penalty Group 3

---

[1] Police were initially dispatched to 323 Kemper Street, but found that address did not exist. After confirming with the caller that the correct address was in fact 325 Kemper, the police arrived at that residence.

[2] When the officers stepped inside they noticed burnt marihuana in an ashtray on a table in plain view; when the officers asked who the marihuana belonged to, Salazar admitted he had been smoking it and he was placed under arrest.

controlled substance, the possession of which requires a prescription label. The quantity of Clonazepam was 2.1 grams.

Garcia filed a pre-trial motion to suppress the drug evidence and her verbal admissions made to the officers at the scene. At the suppression hearing, the only witness was Officer Williams, who testified he saw the pill bottles in plain view as soon as he entered the bedroom and that the bottles were suspicious because they were brown prescription bottles but had no prescription label or any label at all on them. Williams stated that Garcia gave consent for the officers to open the pill bottles and look inside; further, she was not in handcuffs when she was asked the questions about the contents of the bottles. Williams conceded that Garcia's identification listed 325 Kemper as her address, but stated he learned that she resided there after he asked the questions about the pill bottles. Williams testified he did not ask Garcia for consent to search the bedroom; he also explained that the officers did not look in any drawers or closets in the bedroom. Williams conceded that he could have obtained a search warrant for the pill bottles, but stated his belief that he did not need to because he had the consent of the homeowner and the pill bottles were in plain view in the room where they found Ranly and served her arrest warrants.

At the conclusion of the hearing, the trial court made the following findings of fact and conclusions of law on the record:

> I think the State has certainly met their burden by clear and convincing evidence that the authority or the consent to enter the home was given and justified by the fact that Mr. Salazar lived at that address. So are they in the place properly, in the home? I think that they are.
>
> Also, Mr. Salazar indicated that the person that they were seeking to arrest was in the back bedroom, and there - - there's no evidence to show that this bedroom was under the exclusive control of someone other than Mr. Salazar who gave the consent to enter that room. Once they enter that room, they also said

contemporaneously, they are seeing the pill bottles on there and they see that when they make entry.

And I'll agree with you, pill bottles in and of themselves wouldn't allow an officer to just open it up and see what's in there. But I believe the officer when he says, I asked, Hey, whose is that? And the defendant claimed that they were hers and also told him what he would find in there, which, obviously, with no prescription label on it, at least gives the officer probable cause to go in there and identify and in fact confirm that what is in there is what the defendant said was, which was Clonazepam, which you need a prescription for. I think he's allowed to ask those questions at the point that he did without having Miranda warnings. So I'm going to deny your motion to suppress.

After denial of her motion to suppress, Garcia pled no contest to the Class A misdemeanor offense of possession of less than 28 grams of Clonazepam, a controlled substance (Penalty Group 3), and received one year of deferred adjudication community supervision, plus a $200 fine. Garcia now raises several issues in her appeal of the denial of her motion to suppress.

## MOTION TO SUPPRESS EVIDENCE

On appeal, Garcia challenges the denial of her motion to suppress the drug evidence on three grounds: (1) that Salazar did not have authority to consent to the officers' entry into the bedroom, and "ambiguous circumstances" placed a duty on the officers to conduct a further inquiry to determine who had actual authority to consent to a search of the bedroom; (2) that the officers' search exceeded the scope of Salazar's consent; and (3) that the plain view doctrine does not justify the seizure of the pills because the officers were not legitimately in the bedroom and it was not immediately apparent the pills were contraband.

### Standard of Review

In reviewing a trial court's ruling on a motion to suppress, we apply a bifurcated standard of review, affording almost total deference to the trial court's determination of historical facts supported by the record, but reviewing its application of the law to the facts de novo. *Valtierra*

*v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010); *Hubert v. State*, 312 S.W.3d 554, 559 (Tex. Crim. App. 2010); *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008). When, as here, the trial court makes explicit findings of fact on the record, we view the evidence in the light most favorable to the court's rulings and determine whether the evidence supports the fact findings. *Valtierra*, 310 S.W.3d at 447. We review the application of the law of search and seizure to the facts de novo. *Id.* We sustain the trial court's ruling if it is reasonably supported by the record and correct on any theory of law applicable to the case. *Id.* at 447-48.

*Analysis*

The State bore the burden to show the seizure of the drug evidence fell within one of the exceptions to the warrant requirement. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990); *Hubert*, 312 S.W.3d at 561-62. The State relied on the homeowner's consent for the officers' entry into the home and bedroom, and on the plain view doctrine to justify the seizure of the pills from Garcia's purse. *See Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002) (consent is well-established exception to warrant requirement); *State v. Dobbs*, 323 S.W.3d 184, 187 (Tex. Crim. App. 2010) (plain view doctrine permits seizure of items without a warrant). The federal constitution requires the State to meet its burden to prove an exception to the search warrant requirement by a preponderance of the evidence, while the Texas Constitution requires the State to present clear and convincing evidence. *See Maxwell*, 73 S.W.3d at 281. The trial court found the State met its burden under the clear and convincing standard of proof.

*1. Validity of Consent*

*A. "Involuntary Consent"*

Garcia asserts that Salazar's consent was involuntary because the officers "falsely represented" they had valid arrest warrants for Ranly, but did not have the actual arrest warrants

with them and did not confirm the warrants before their entry into the home; therefore, Garcia contends the officers entered the home under false pretenses. While Officer Williams conceded he did not have the physical arrest warrants for Ranly with him at Salazar's home, he testified that he did confirm the existence of the warrants for Ranly *before* the officers went to the home. Further, Officer Williams stated that, after identifying Ranly, the officers called and confirmed that Ranly's warrants were active before arresting her. Given Officer Williams' testimony, Garcia's argument that the State presented "no proof" at the suppression hearing of a valid arrest warrant for Ranly fails. Moreover, there is nothing in the record to suggest the officers made any false statements to Salazar concerning the Ranly warrants, or otherwise entered the home under false pretenses. Considering that the validity of an alleged consent is a question of fact to be determined from the surrounding circumstances, and the trial judge is the sole judge of the credibility of the witnesses, we conclude the record before us supports the trial court's finding that Salazar's consent was voluntary, i.e., not based on false information.[3] *See Maxwell*, 73 S.W.3d at 281 (internal citations omitted).

### B. Authority to Consent to Bedroom Entry

Garcia next asserts that, even if Salazar's consent to enter the home was valid, ambiguous circumstances arose which required the officers to make further inquiry concerning who had actual authority to consent to an entry of the bedroom. Specifically, Garcia argues that "once the officers learned that there were other individuals in the room, which was before they even entered the room, they were required to conduct further investigation to quell the ambiguous

---

[3] At oral argument, the parties debated whether the record shows Salazar was the person who called the police to come arrest Ranly. While the record may support competing inferences—Salazar did not ask why the officers were at his home, or express surprise at their arrival, merely confirming Ranly's presence and directing them to her location, yet he also admitted smoking marihuana in plain view prior to their arrival—whether or not Salazar was the caller is not a critical fact because the evidence is undisputed that he was the homeowner and consented to the officers' entry.

situation and determine whether anyone in the room had actual authority to give consent to search the room." Garcia relies primarily on *Corea v. State*, 52 S.W.3d 311 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd), in which the court held that the State cannot meet its burden of proving actual or apparent authority for a consent to search if officers are faced with an ambiguous situation and proceed without making further inquiry concerning the person's authority to give consent. *Id.* at 317 (citing *Rodriguez*, 497 U.S. at 188-89 (1990)); *see Valdez v. State*, 336 S.W.3d 330, 335 (Tex. App.—San Antonio 2010, no pet.) (recognizing that apparent authority doctrine does not allow officers to proceed without inquiry when ambiguous circumstances exist concerning consenting party's authority).

Here, there is nothing in the record to show the officers were faced with an ambiguous situation concerning authority to consent to entry into the bedroom. Even though there was evidence that Garcia's identification listed 325 Kemper as her address, Officer Williams stated such knowledge was acquired after the officers entered the bedroom and obtained identification from the three women. Further, there was no evidence presented at the suppression hearing that Garcia had exclusive control over the bedroom; in fact, there was no evidence presented that the bedroom was Garcia's room at all. On the other hand, the evidence that Salazar was the homeowner was undisputed,[4] and there was no evidence indicating any restriction on his full access to all areas of his home. Therefore, the record does not show that any ambiguous circumstances arose which would support a duty to conduct a further inquiry into who had authority to consent to entry of the bedroom. In the absence of any evidence that someone else had exclusive control over the bedroom, Salazar as the homeowner had the actual authority to consent to entry of the bedroom. *Cf., Corea*, 52 S.W.3d at 316 (third party occupant told officers that only appellant lived in a particular bedroom, which the court held negated the third party's

---

[4] Garcia conceded at oral argument that Salazar was the homeowner.

actual authority over the bedroom); *Riordan v. State*, 905 S.W.2d 765, 765, 771 (Tex. App.— Austin 1995, no pet.) (police knew person giving permission to search home was elderly neighbor who was only babysitting at the house).

Even assuming Salazar did not have actual authority to consent to entry of the bedroom, he had apparent authority because, in the absence of any evidence concerning the occupant of the bedroom, it was reasonable for the officers to believe Salazar had common authority over the bedroom. *See Rodriguez*, 497 U.S. at 188; *Hubert*, 312 S.W.3d at 561; *Valdez*, 336 S.W.3d at 336-37. There were no ambiguities present in the situation that would have given the officers reason to doubt Salazar's apparent authority over the entire house.

Based on the record, the State met its burden of proving that Salazar had actual, or at least apparent, authority to consent to entry of the bedroom, and the trial court properly made such findings. *See Rodriguez*, 497 U.S. at 181.

### 2. Scope of Consent

Next, Garcia asserts the officers' additional investigation into the unlabeled pill bottles after Ranly's arrest exceeded the scope of Salazar's consent. Garcia argues that Salazar's consent was given for the limited purpose of locating and arresting Ranly, and once that purpose was accomplished, the consent was not effective as to the seizure of the pills from Garcia's purse.

Consent to enter a residence does not by itself constitute consent for an officer to search the entire residence or the objects located in the residence. *Valtierra*, 310 S.W.3d at 448. An officer's actions once he has entered the residence are limited by the purpose for which he was allowed entry. *Id.* We measure the scope of consent under the "objective reasonableness" standard, determining what a typical reasonable person would have understood by the exchange

between himself and the officer. *Id.* at 449 (citing *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). A person may limit the scope of his consent, but if the consent is open-ended, then a reasonable officer would have no reason to believe the search will be limited. *Id.* In addition, if an officer's further actions are met with silence, consent to such further actions may be implied. *Id.*

Here, Salazar directed the officers to go down the hall to the bedroom for the purpose of arresting Ranly. The officers entered the bedroom, asked for identification from the three women present, and located Ranly. The officers did not search the bedroom beyond observing what was in plain sight—the unlabeled pill bottles sticking out of a purse on the dresser. Even though the purpose for which the officers entered the bedroom was to arrest Ranly, as discussed below, and as found by the trial court, they were permitted to ask general questions concerning the pill bottles they observed in plain sight and believed to be connected to commission of a crime.

### 3. *Plain View Doctrine*

Finally, Garcia complains that the plain view doctrine does not validate the seizure of the pills because the officers were not legitimately present in the bedroom, and it was not immediately apparent the pills were contraband. The issue of the officers' entry into the bedroom has already been addressed, and Garcia's challenges to the presence of the officers in the bedroom have been rejected. Therefore, only Garcia's argument that it was not "immediately apparent" that the pills were contraband remains.

Police who are lawfully present on private property pursuant to an exception to the Fourth Amendment's warrant requirement may lawfully seize anything they observe in plain view if it is "immediately apparent" to them that it constitutes contraband; the phrase "immediately apparent" means the officer has probable cause to believe that the item is

contraband. *Dobbs*, 323 S.W.3d at 187, 189 (citing *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)). The facts in this case are similar to those in *Dobbs* in which the officers were legitimately on the private premises pursuant to a search warrant for narcotics and observed sets of golf clubs and golf shirts in plain view while in the course of executing the warrant. *Id.* at 187. The officers initially lacked probable cause to believe the golf clubs and shirts were connected to a crime, but contacted dispatch to inquire about any recent burglaries and matched the description of the stolen golf merchandise to the clubs and shirts while the officers were still on the premises. *Id.* The Court held that the officers' further investigation into the golf clubs and shirts did not involve any greater intrusion on the premises than the intrusion already legitimately underway pursuant to the search warrant; therefore, the seizure of the items in plain view was lawful without the necessity of a warrant. *Id.* at 187-89. The Court explained that the phrase "immediately apparent" in the context of the plain view doctrine means "without the necessity of any further search;" it does not necessarily mean "quickly" apparent. *Id.* at 189. This understanding of "immediately apparent" permits the officer on the scene to generate his own probable cause through further investigation while still legitimately on the premises so long as the further investigation does not involve an "unjustifiedly incremental search" of the premises. *Id.* at 188.

Here, the officers lacked probable cause to believe the pills were contraband until they conducted a further investigation by questioning the women in the room and by calling poison control. Officer Williams testified that it is not illegal to possess prescription pill bottles; however, he also testified that the brown bottles he observed sticking out of the purse were suspicious because they had no prescription labels, or any other type of label, attached. This plainly apparent fact led him to ask who was the owner of the purse. Garcia voluntarily

answered and admitted ownership of not only the purse but the pill bottles as well. After Williams followed up by asking her what the pills were, Garcia told him one was Clonazepam, a controlled substance that requires a prescription. Williams stated that Garcia consented to his opening the pill bottles to observe the pills' appearance; he then called poison control and described the pills' appearance and confirmed the identity of one as Clonazepam. As in *Dobbs*, while still on the premises, Williams developed probable cause to believe the pills were contraband during a limited further investigation that did not involve any greater intrusion on the premises than the entry required to arrest Ranly. *See id.* at 187-89.

Citing footnote 12 of *Dobbs*, Garcia argues the officers' further investigation into the pills constituted an unreasonable temporal expansion beyond the time required for the initial purpose, i.e., the arrest of Ranly. *See id.* at 188 n.12. The court in *Dobbs* merely recognized the potential for a further investigation that expanded "temporally" beyond the time required for the initial purpose, stating that such a temporally expanded ancillary investigation *could* constitute an unjustified invasion on the defendant's privacy interest. *Id.* (emphasis added). As in *Dobbs*, there is nothing in the record before us to suggest that the officers intentionally took their time or stalled as a mere pretext to give them the opportunity to conduct a further investigation. *See id.* The trial court's findings properly reflect that the officers initially lacked probable cause, but developed it while still on the premises by asking a limited number of questions to identify one of the pill bottles as containing a controlled substance.

*Conclusion*

As quoted *supra*, the trial court expressly found that the State met its burden by clear and convincing evidence to establish that Salazar had the authority to and did consent to entry of the home and the bedroom; the court also found that Salazar indicated to the officers that the suspect

they were seeking to arrest was located in the bedroom and thus gave consent for them to enter the bedroom. The court further found there was no evidence to show the bedroom was under the exclusive control of anyone other than Salazar. Based on these fact findings, which are supported by the record, the court concluded the officers were properly present in the bedroom. Being legitimately present in the bedroom, the officers observed the unlabeled pill bottles in plain view and conducted a limited further investigation through which they developed probable cause to believe some of the pills were contraband. The court's fact findings are supported by the record, and its conclusions of law are correct applications of the law to the facts.

## MOTION TO SUPPRESS STATEMENTS

In her last issue, Garcia asserts the trial court should have suppressed her verbal statements made in response to Officer Williams' questions about the pills because she was in custody for purposes of *Miranda* and did not receive her *Miranda* warnings prior to her admissions. The issue of whether Garcia was in custody, and therefore entitled to receive the *Miranda* warnings, turns on whether she herself was under detention at the time she made the admissions. *See Garcia-Cantu*, 253 S.W.3d at 238 (a "detention" implicates constitutional search and seizure restrictions and requires an articulable suspicion, while an "encounter" between a citizen and police does not trigger any constitutional restrictions). Whether the facts surrounding the interaction between Officer Williams and Garcia constituted a police-citizen encounter or an investigative detention for purposes of the Fourth Amendment is reviewed de novo because it is an issue of application of the law to the facts. *Id.* at 241; *State v. Castleberry*, 332 S.W.3d 460, 466 (Tex. Crim. App. 2011).

Interactions between the public and the police fall into three categories: (1) consensual police-citizen encounters which require no objective justification; (2) investigative detentions

- 12 -

which require articulable reasonable suspicion; and (3) arrests which require probable cause. *Castleberry*, 332 S.W.3d at 466. During a police-citizen encounter, an officer may ask general questions without any basis for suspicion, including requesting identification and other information, and the citizen is free to decline to answer. *Id.* The fact that a citizen answers the officer's question, or otherwise complies with a request, does not negate the consensual nature of the encounter. *Id.* To evaluate whether an encounter between a citizen and a police officer has risen to the level of a Fourth Amendment "seizure," in the form of either a detention or an arrest, the facts surrounding the interaction must be evaluated to determine whether the officer has restrained the citizen's liberty through physical force or show of authority. *Id.*; *Garcia-Cantu*, 253 S.W.3d at 242, 244. There is no bright-line rule for determining when an encounter becomes a seizure. *Castleberry*, 332 S.W.3d at 466-67. In determining whether a person was "seized" for purposes of the Fourth Amendment, we step into the shoes of the defendant and determine whether, based on the totality of the circumstances viewed from an objective perspective, a reasonable person would have felt free to ignore the officer's request or terminate the encounter. *Id.* at 467; *Garcia-Cantu*, 253 S.W.3d at 244. "If ignoring the request . . . was an option, then no Fourth Amendment seizure has occurred." *Castleberry*, 332 S.W.3d at 467. Therefore, the relevant inquiry here is whether the totality of the circumstances show the police encounter had risen to the level of a detention with respect to Garcia before she made the statements.

The facts developed at the suppression hearing on this issue are brief. Officer Williams testified that he posed the question "who does this purse belong to?" to the group, and Garcia answered that the purse and the pill bottles belonged to her. When he asked, "what are the pills?" Garcia answered that they were Vicodin and Clonazepam. Officer Williams testified that

he did not recall whether he gave Garcia her *Miranda* rights before questioning her about the contents of the pill bottles; however, he also testified that his report would have stated that he read Garcia her *Miranda* rights if he had done so, and the report contains no such statement. Officer Williams further testified that Garcia was not in handcuffs when he asked the questions about the pills while in the bedroom.

Garcia asserts that she was in custody at the time she made the incriminating statements because she was "boxed in" and unable to exit the bedroom due to the officers' presence; therefore, her freedom to leave was restricted and she was "seized," i.e., detained. However, there is no evidence in the record to support the assertion that Garcia was "boxed in" or otherwise restrained from leaving the bedroom; there is no evidence concerning the placement of the officers and the women within the bedroom. Garcia did not testify at the suppression hearing, and the only evidence consists of Officer Williams' testimony set forth above.

In addition, the nature of the questions asked by Officer Williams was general and neutral, not hostile or intimidating in tone. The initial question concerning ownership of the purse was directed to the group as a whole; although free to ignore the officer's question, Garcia chose to speak up and admit ownership. There is no evidence that the officers singled out Garcia or addressed her directly before she voluntarily answered the question about who owned the purse. Because Garcia was free to remain silent in response to the question, this encounter had not yet risen to the level of a seizure. *See Castleberry*, 332 S.W.3d at 466-67 (where ignoring officer's question is an option, no seizure had occurred, and answer to question does not negate consensual nature of encounter). Until Garcia chose to answer and admit her ownership of the purse and pill bottles, and to identify one set of pills as the controlled substance Clonazepam, the officers had no reason to suspect her of any criminal activity; their sole purpose for being in the

bedroom was to arrest Ranly. It was Garcia's voluntary answers linking herself to the purse and the Clonazepam that gave rise to reasonable suspicion to detain her — at which time she was "seized" for purposes of the Fourth Amendment; her seizure did not occur until after she made the incriminating admissions. *See Garcia-Cantu*, 253 S.W.3d at 238.

We conclude the facts support the trial court's finding that the officers had the right to ask the questions without *Miranda* warnings because, as to Garcia, the interaction at that point was only a police-citizen encounter, and did not rise to the level of a detention and arrest until after she made her verbal statements admitting ownership of the Clonazepam. *See id.*; *see also Castleberry*, 332 S.W.3d at 468.

## CONCLUSION

Based on the foregoing reasons, we hold the trial court did not err in denying Garcia's motion to suppress the drug evidence and statements, and we affirm the trial court's judgment.

Phylis J. Speedlin, Justice

DO NOT PUBLISH